PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-4185
_____

KENYATTA JOHNSON, Individually and as a 2008
Democratic Party Primary Candidate for State Representative
and Elector and on Behalf of All Citizens Within the 186th
Legislative District of All Citizens of Philadelphia;
DAMON K. ROBERTS, Individually and as a 2007
Democratic Party Candidate for a Philadelphia City Council
and Elector and on Behalf of All Citizens Within the Second
Councilmanic District and all Citizens of Philadelphia,
                                        Appellants,

v.

CITY AND COUNTY OF PHILADELPHIA
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-08-cv-01748)
District Judge:  Hon. James Knoll Gardner
_____

Argued
November 8, 2011


Before:  SCIRICA, SMITH, and JORDAN, *Circuit Judges*.


(Filed: December 27, 2011)
_____

Lawrence M. Otter   [ARGUED]
422 Belmont Avenue
P. O. Box 2131
Doylestown, PA   18901
        *Counsel for Appellants*

Craig R. Gottlieb   [ARGUED]
Craig M. Straw
City of Philadelphia
Law Department
1515 Arch Street – 17th Fl.
Philadelphia, PA   19102
        *Counsel for Appellee*

_____


OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Kenyatta Johnson and Damon K. Roberts (collectively, "Appellants") appeal the District Court's grant of summary judgment for the City of Philadelphia (the "City"), contending the District Court erroneously concluded that a City ordinance prohibiting the posting of signs on street poles passes constitutional muster under the First, Fourteenth, and Twenty-Fourth Amendments of the United States Constitution. For the reasons that follow, we will affirm.

## I.      Background

### A.      *The Ordinance*

Appellants challenge the constitutionality of a City ordinance that prohibits the posting of signs on utility poles, streetlights, sign posts, and trees in a public right-of-way. Enacted after a similar ordinance was enjoined on First Amendment grounds,[1] the ordinance now at issue was designed to cure the earlier ordinance's constitutional infirmities (App. at 110; 118) and to promote public safety and aesthetics in the City (*see* App. at 108-09 (testimony from the Director of Legislative Affairs for the City's Department of Licenses and Inspections stating that signs are a "source of blight" that "[a]side from being visually unattractive ... also

---

[1] The prior ordinance was enjoined because it was content-based and provided the City with unfettered discretion in deciding which signs could be posted. *See Bella Vista United v. City of Phila.,* No. 04-1014, 2004 WL 825311, at \*4-7 (E.D. Pa. Apr. 15, 2004).

present[] problems related to public safety, by causing distractions for motorists operating vehicles")).

Specifically, the present ordinance states that, except as provided in accordance with a program permitting banners under certain circumstances (the "Banner Program"),[2] no person may post any "banners, pennants, placards, posters, stickers, advertising flags, [or] plaques," Philadelphia Code § 10-1201, on any "utility pole," "streetlight," "traffic or parking sign or device, including any post to which such sign or device is attached," "historical marker," or "City-owned tree or tree in the public right-of-way," *id.* § 10-1202(a)(1)-(5). The ordinance further provides that any violating sign "may be removed by the Department of Licenses & Inspections or its designees," *id.* § 10-1203(a), with the party "responsible for the posting of [the] sign" bearing "the cost incurred in [its] removal" as well as "a penalty of $75," *id.* § 10-1203(b). The ordinance does not prohibit signs on private property, or otherwise restrict communication.

B.    *Appellants' Constitutional Challenge*

At the time their actions were brought, Appellants were both candidates for political office in an area of the City that contains "a classic urban landscape of row house

_____

[2] The ordinance's restrictions do not extend to the posting of signs on "a streetlight provided the sign complies with the requirements of the Banner Program, as defined by regulations promulgated by the Department of Streets." Philadelphia Code § 10-1202(b). The Banner Program permits high flying banners constructed of nylon or similar material to hang atop City street poles.

4

neighborhoods, where most homes have no front yard."[3] (App. at 56.) By their own description, Appellants had relatively scarce resources to expend on their campaigns. Johnson spent only $9,693.78 on his campaign, and Roberts spent $14,698.00 with unpaid debts of $7,187.00. They assert that, given their limited funds, they would have ordinarily relied heavily on signs posted on street poles to spread their political messages.[4] However, if they had done so, they each faced the possibility of incurring significant fines because of the City's ordinance. Indeed, Johnson received a letter from the City advising him that he must remove any signs placed in contravention of the ordinance or "be billed for the cost incurred for the removal plus a $75 penalty," (App. at 71), and Roberts, like several other political candidates and private businesses responsible for violating the City's ordinance, received numerous tickets.

---

[3] Roberts was an unsuccessful Democratic Party primary candidate for Philadelphia City Council in the May 2007 primary. Johnson was a Democratic Party nominee for State Representative in the 186th legislative district, and ultimately won the primary and general election for that position. Initially, Appellants brought separate civil actions challenging the City's ordinance. After permitting Johnson to amend his complaint to add Roberts as a plaintiff, however, the District Court consolidated the two cases and closed Roberts's separate action.

[4] Johnson, for example, purchased 5,000 signs for his campaign. Such signs were available for as little as $0.20 per sign.

In support of their constitutional challenge, Appellants submitted affidavits from Johnson and his campaign manager, as well as a letter-report authored by Joe Long of the Northampton County Democratic Committee. Long's report is fashioned as an expert opinion regarding the ordinance's impact on Appellants' campaigns. It claims that the City's ordinance "totally bans one of the most effective campaign tools – political signs," which "eliminate[s] any chance of electoral success" for candidates with limited resources, inasmuch as political signs are inexpensive and "can be localized in a fashion that no other medium offers." (App. at 227b.[5]) The affidavits are to the same effect, declaring that street signs are an extremely effective campaign tool that have no substitute.

## C. *The District Court Proceedings*

After Johnson filed his initial complaint, he moved for a preliminary injunction. The District Court referred the motion to a Magistrate Judge, who held a hearing on the motion and denied it, observing that "[t]he content-neutrality of the challenged ordinance has been conceded" (App. at 47) and deciding that Johnson was unlikely to succeed on the

---

[5] The appendix contains pagination errors; it is consecutively paginated from pages 1 to 233 at which point the pagination reverts to page 224 before ending on page 237. Thus, there are duplicate pages in the appendix numbered 224, 225, 226, 227, 228, 229, 230, 231, 232, and 233. For citation purposes, we have chosen to refer to the first set of duplicate numbering as App. 224a to App. 233a, and to the second set of duplicated numbering as App. 224b to App. 233b.

6

merits.  As noted *supra* note 3, Roberts was later added as a plaintiff and his own civil action was consolidated with Johnson's.  The City then moved for summary judgment, which was granted.  The District Court concluded that there was no genuine issue of material fact and that the City was entitled to judgment on Appellants' claims.

This timely appeal followed.

## II.    Discussion[6]

Appellants argue that the City's ordinance violates the First, Fourteenth, and Twenty-Fourth Amendments, and that the District Court erred by concluding otherwise and granting the City's motion for summary judgment.  We address those contentions in turn.

---

[6] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331.  We have jurisdiction over this appeal under 28 U.S.C. § 1291, and exercise "plenary review of [the] district court's grant of summary judgment." *Funk v. CIGNA Grp. Life Ins.*, 648 F.3d 182, 190 (3d Cir. 2011).  Accordingly, we view the facts in Appellants' favor to determine whether the District Court correctly found that "there [was] no genuine dispute as to any material fact and [that the City was] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Funk*, 648 F.3d at 190 ("Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." (citation omitted)).

7

A.      *Appellants' First Amendment Claims*[7]

Appellants allege that the City's ordinance violates the First Amendment because it is a restriction on political speech.  *See* U.S. Const. amend. I ("Congress shall make no law ... abridging the freedom of speech ... ."); *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 792 n.2 (1984) ("Under the Fourteenth Amendment, city ordinances are within the scope of [the First Amendment's] limitation on governmental authority.").

1.      *Whether the Ordinance is Content Neutral*

The first step in assessing the First Amendment claims is to determine whether the City's ordinance is content-neutral or content-based.  *Rappa v. New Castle Cnty.*, 18 F.3d 1043, 1053 (3d Cir. 1994).  "If a [restriction on speech] is content-based, then the [City] is required 'to show that the regulation is necessary to serve a compelling [government] interest and that it is narrowly drawn to achieve that end.'" *Id.* (quoting *Boos v. Barry*, 485 U.S. 312, 321 (1988) (internal marks omitted)).  If, however, a regulation is content-neutral, a different, more lenient test applies.  *See id.* at 1053-54. Content-neutral ordinances, even if imposed "in a public forum," do not offend the First Amendment as long as the restrictions (1) "are narrowly tailored to serve a significant governmental interest"; and (2) "leave open ample alternative

---

[7] Counts One and Two of Appellants' complaint plead two separate First Amendment claims in connection with their challenge to the City's ordinance.  Because those claims are essentially identical, we treat them collectively.

channels for communication of the information." *Id.* at 1054 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *see Melrose v. City of Pittsburgh*, 613 F.3d 380, 388 (3d Cir. 2010) (same).

Here, resolving the threshold question of content neutrality is straightforward. When asked at oral argument, Appellants' counsel acknowledged that the ordinance is content-neutral. Although their briefing periodically implies otherwise,[8] Appellants have conceded the point, and they were wise to do so. We thus take the content-neutrality of the ordinance as a given and turn to assess its constitutionality under that rubric. Accordingly, we must consider whether the ordinance is narrowly tailored to serve a significant government interest and whether it leaves open ample alternative channels for communication.

---

[8] For example, Appellants' briefing states that because the ordinance "totally bans posting of *political signs* within the public right of way," it must be "subject to the highest level of scrutiny that applies to the regulation of a public forum." (Appellants' Br. at 13 (emphasis added).) Appellants also suggest that the ordinance is content-based because it favors commercial speech, given the opportunity for such speech afforded by the Banner Program. However, as the District Court correctly observed, the claim that the Banner Program favors commercial speech is factually unsupported. Moreover, the Banner Program is administered separately, and Appellants – by their own representation at oral argument – did not apply to participate in it. Therefore, the assertion that the Banner Program favors commercial speech cannot be credited in assessing the ordinance's constitutionality.

2. *Whether the Ordinance is Narrowly Tailored to Serve a Significant Government Interest*

i. *The Asserted Government Interest*

Appellants first argue that the City's ordinance does not serve a significant government interest. As a preliminary matter, it is clear from Supreme Court precedent that "the goals of 'traffic safety and the appearance of the city[ ] are substantial governmental goals.'" *Riel v. City of Bradford*, 485 F.3d 736, 751 (3d Cir. 2007) (quoting *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507-08 (1981) (plurality opinion)); *see Taxpayers for Vincent*, 466 U.S. at 805 ("It is well settled that the state may legitimately exercise its police powers to advance esthetic values"); *Rappa*, 18 F.3d at 1075 ("[T]he sufficiency of the government's interest in aesthetics and safety has, by this juncture, become unquestioned."). Here, as previously noted, the record indicates that the City's ordinance was intended to promote those legitimate and significant values. (*See* App. at 109 (referring to blight and to the safety of motorists).)

Nevertheless, citing our decision in *Rappa v. New Castle County*, in which we held that a regulation prohibiting campaign signs in public rights-of-way was an unconstitutional content-based restriction on speech,[9]

---

[9] In *Rappa*, the plaintiff asserted a First Amendment challenge after "a large number of [his political campaign] signs along Delaware's roadways" were "peremptorily removed by state and local authorities on the grounds that they were in violation of laws and ordinances enacted by the

10

Appellants argue that the City's asserted interest in safety and aesthetics "fails." (Appellants' Br. at 14-15.) Their argument seems to be that there is no evidence supporting those proffered considerations, particularly when the City "allows banners to be posted [under the Banner Program] on the very poles where it bans political signs." (Appellants' Br. at 24.) To a large extent, then, Appellants' contention that the City's ordinance does not serve a significant state interest depends on the premise that the City's ordinance targets political signs. The legislation we struck down in *Rappa* did that, *see Rappa*, 18 F.3d at 1047 ("Although Rappa's [political] signs were barred, a number of other types of signs ... were permitted."), and we rejected the government's argument in that case that the restriction on political signs was justified due to the fact that "campaign signs tend to proliferate more than other signs and therefore create greater safety and aesthetic problems than other signs," *id.* at 1070.

Here, however, unlike the disputed ordinance in *Rappa*, the City's ordinance is content-neutral – a point which, as discussed earlier, Appellants have expressly acknowledged. In other words, the City's ordinance does not simply prohibit political speech; it prohibits all speech in the form of temporary signs on utility poles, streetlights, sign posts, and trees in the public right-of-way, and there is no evidence that it is selectively enforced or was crafted for the purpose of prohibiting political speech in particular. Instead, every indication in the record is that the ordinance was intended to promote public safety and reduce blight. (*See* App. at 109.) Under these circumstances, the City's

States of Delaware ..., the County of New Castle ..., and the City of Wilmington." *Rappa*, 18 F.3d at 1047.

11

judgment that such goals are advanced by the ordinance is accorded deference "unless [that judgment] is facially unreasonable." *Frumer v. Cheltenham Twp.*, 709 F.2d 874, 877 (3d Cir. 1983) (citing *Metromedia*, 453 U.S. at 507-08). Because we cannot say the City's judgment fails that test, we are bound to recognize that the ordinance advances significant government interests. *Id.*

ii.     *The Scope of the Ordinance*

That does not end our inquiry, however, as the ordinance must be narrowly tailored to serve the City's interest in safety and aesthetics. *Rappa*, 18 F.3d at 1054. In order to be narrowly tailored, a regulation "need not be the least restrictive or least intrusive means of" furthering the identified interest. *Ward*, 491 U.S. at 798. "Rather, the requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id.* at 799 (citation omitted).

Appellants argue that the City's ordinance is not narrowly tailored because it "chose to solve its sign problem ... by the use of an unconstitutional sledge hammer" that "banned all speech." (Appellants' Br. at 19.) The Supreme Court's decision in *Members of City Council v. Taxpayers for Vincent* is instructive in assessing that contention. There, the Court considered the constitutionality of an ordinance that was, in all material respects, similar to the ordinance at issue here. Most importantly, like the City's ordinance, the ordinance in *Taxpayers for Vincent* "prohibit[ed] the posting of signs on public property," 466 U.S. at 791, but not on

12

private property, *see id.* at 811. The Supreme Court held that the *Taxpayers for Vincent* ordinance was narrowly tailored to serve the interests of safety and aesthetics because it "respond[ed] precisely to the substantive problem which legitimately concern[ed] the City" and "curtail[ed] no more speech than [was] necessary to accomplish its purpose." *Id.* at 810; *see id.* at 808 ("By banning these signs, the City did no more than eliminate the exact source of the evil it sought to remedy."). Moreover, the Court in *Taxpayers for Vincent* reached that conclusion even though the ordinance at issue – like the present ordinance – was arguably of insufficient scope to fully remedy the evil caused by signs in that it did not ban signs on private property. *See id.* at 811 ("The private citizen's interest in controlling the use of his own property justifies the disparate treatment.").

The City's ordinance in this case is, for all practical purposes, indistinguishable from the ordinance upheld in *Taxpayers for Vincent* as narrowly tailored to serve the same interests as are implicated here. Thus, the City's ordinance can be said to "curtail[] no more speech than is necessary to accomplish its purpose." *Id.* at 810.

Appellants' argument to the contrary appears to depend on the belief that the City has "banned all speech."[10]

---

[10] As discussed *infra*, Appellants' position is further undermined by their expert's report, which is based on the same mistaken belief. Long criticizes the ordinance's impact on low budget campaigns because "[t]here is absolutely no reasonable or viable alternative for an individual to make his political views known to his neighbor than the venerable political poster *in his or her front yard*." (App. at 227b

13

In reality, however, the ordinance does not ban all speech; it bans only "signs," and that ban extends only to certain specifically defined portions of City property.[11] Moreover, it can hardly be denied that the City's interest would be more difficult to achieve without the regulation, as the source of the problem – the proliferation of signs – would otherwise be permitted on City street poles. Accordingly, we conclude that the City's ordinance is narrowly tailored to serve the government's interests in safety and aesthetics.

> 3. *Whether the Ordinance Leaves Open Ample Alternative Channels of Communication*

Having determined that the City's content-neutral ordinance is narrowly tailored to serve a significant governmental interest, we next examine whether it leaves

---

(emphasis added).) But, as Appellants have had to acknowledge, the ordinance does not ban yard signs. Indeed, over half of the 5,000 signs Johnson purchased were posted on private property, including the windows of houses and businesses.

[11] As described above, the term "signs" includes "banners, pennants, placards, posters, stickers, advertising flags, and plaques." Philadelphia Code § 10-1201. The ban on signs extends to signs posted on any City "utility pole," "streetlight," "traffic or parking sign or device, including any post to which such sign or device is attached," "historical marker," or "City-owned tree or tree in the public right-of-way." *Id.* § 10-1202(a)(1)-(5).

open ample alternative channels for communication. *Rappa*, 18 F.3d at 1054.

Appellants contend that the City's ordinance does not afford sufficient alternative channels because "political posters have unique advantages including low cost and convenience to achieve name recognition," especially in Philadelphia's "gritty urban landscape with no front lawns." (Appellants' Br. at 17, 20.) Underlying that line of reasoning is the notion that Appellants should be afforded the opportunity to speak in their preferred, most cost-effective, medium. The law, however, provides no such entitlement. *See, e.g.*, *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) ("[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired.").

Instead, "[t]he Supreme Court has required that an alternative means of communication provide only a 'reasonable opportunity' for communication of the speaker's message." *Galena v. Leone*, 638 F.3d 186, 203 (3d Cir. 2011). Accordingly, a speaker is not entitled to his or her favored or most cost-effective mode of communication. *See, e.g.*, *Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 101 (2d Cir. 2006) ("The requirement that 'ample alternative channels' exist does not imply that alternative channels must be perfect substitutes for those channels denied to plaintiffs by the regulation at hand ... ."). He or she must simply be afforded the opportunity to "reach the 'intended audience,'" *Startzell v. City of Phila.*, 533 F.3d 183, 202 (3d Cir. 2008) (citation omitted), in an adequate manner, *see Taxpayers for Vincent*, 466 U.S. at 812 ("[A] restriction on expressive activity may

15

be invalid if the remaining modes of communication are inadequate.").

It is clear that the City's ordinance allows ample alternative avenues for communication. While the ordinance in *Taxpayers for Vincent* – like the City's ordinance – prohibited the posting of signs on street poles, the Supreme Court was satisfied with the district court's finding that there was nothing about "the posting of political posters on public property [that is] a uniquely valuable or important mode of communication." 466 U.S. at 812. The Court relied on the district court's finding that the plaintiffs had several alternative avenues for communication: "they remain[ed] free to picket and parade, to distribute handbills, to carry signs and to post their signs and handbills on their automobiles and on private property with the permission of the owners thereof." *Id.* at 795.

Here, too, notwithstanding Appellants' conclusory pronouncements that there is simply no way to wage a low-budget campaign in Philadelphia in compliance with the City's ordinance, the evidence demonstrates that there are several other avenues of communication. Roberts and Johnson themselves engaged in other means of campaigning,[12] and, in Johnson's case at least, it was

_____

[12] Johnson was featured in a South Philadelphia newspaper at no cost to his campaign, had a campaign website, and also conducted a series of radio advertisements. Unfortunately, there is little-to-no information in the record about Roberts's means of campaigning, although it appears that he expended campaign funds for printing signs and running newspaper advertisements.

16

effective; he waged a successful campaign in spite of the ordinance's restrictions, winning both the Democratic primary and the general election for State Representative. Furthermore, the City's ordinance has no bearing on a candidate's ability to enjoy what Appellants' own expert indicated is the single most effective communication technique, namely, placing political posters on private property. (*See* App. at 227b ("There is absolutely no reasonable or viable alternative for an individual to make his political views known to his neighbor than the venerable political poster in his or her front yard.").)

As Appellants evidently recognize, then, there is tremendous value in being able to post political signs on private property. Likewise, the Supreme Court has noted:

> residential signs play an important part in political campaigns, during which they are displayed to signal the resident's support for particular candidates, parties, or causes. They may not afford the same opportunities for conveying complex ideas as do other media, but residential signs have long been an important and distinct medium of expression.

*City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994) (internal footnote omitted). We have likewise observed that "[p]osting a sign on one's own property may not only be easier and less expensive than alternative means of communication, but may be a unique means of self-expression for the property owner." *Rappa*, 18 F.3d at 1077. It bears emphasis, in this regard, that over half of Johnson's political posters were placed on private property. Clearly, signs on private property are a valuable

and regularly utilized campaign tool that – at least when combined with other avenues of communication – provide a sufficient alternative to the sign-posting forbidden by the City. *Taxpayers for Vincent*, 466 U.S. at 811-12.

Because the City's ordinance is content-neutral, narrowly tailored to serve a significant government interest, and leaves open ample alternative channels for communication, the District Court properly entered judgment in the City's favor on Appellants' First Amendment claims.

B.    *Appellants' Fourteenth Amendment and Twenty-Fourth Amendment Claims*

Appellants also argue that the District Court erred in granting summary judgment against them on their Fourteenth Amendment and Twenty-Fourth Amendment claims.[13]

_____

[13] The City argues that Appellants have waived those claims on appeal because they did not properly present them in their statement of the issues or summary of the argument. *See Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993) ("It is well settled that if an appellant fails to comply with [the requirement of setting forth an issue in the Statement of the Issues and Argument sections], the appellant normally has abandoned and waived that issue on appeal and it need not be addressed by the court of appeals."). While Appellants make relatively little reference to the Fourteenth and Twenty-Fourth Amendment arguments in their brief, we choose to consider them because they do sufficiently appear in Appellants' argument. *Cf. id.* (declining to address appellants' arguments where the issues were not set forth in either the issue statement or "in the remainder of [the appellants'] brief").

Their Fourteenth Amendment claim appears to be based on the belief that the Banner Program favors commercial speech over political speech and, therefore, violates the Equal Protection Clause. As previously noted, however, that factual contention is entirely unsupported by the record. Appellants' complaint acknowledges as much, stating that "[Appellants] are not aware that any political candidates ever used the so called 'Banner Program' as a form of campaigning for political office," (App. at 63), and Appellants concede that they did not seek to participate in that program. Accordingly, there is no genuine issue of material fact for trial as to Appellants' Fourteenth Amendment claim. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (summary judgment should be granted when, viewing the facts in the light most favorable to the non-moving party, no reasonable jury could find for that party).

Appellants' Twenty-Fourth Amendment claim is that the City's ordinance is an unlawful poll tax.[14] That too is

---

[14] To support their claim, Appellants' complaint cites both the Twenty-Fourth Amendment and the Fourteenth Amendment's Equal Protection Clause. The Twenty-Fourth Amendment provides that the "right of citizens of the United States to vote in any primary or other election for President or Vice President, ... or for Senator or Representative in Congress, shall not be denied or abridged ... by reason of failure to pay any poll tax or other tax." U.S. Const. amend. XXIV, § 1. The Equal Protection Clause, as Appellants' employ it in this context, prohibits the state from "mak[ing] the affluence of the voter or payment of any fee an electoral

19

without foundation. Conclusively, the Twenty-Fourth Amendment, by its express terms, has no application to state and local elections. *See* U.S. Const. amend. XXIV, § 1 (relating to the right to vote in certain federal elections). Although Appellants point out that "Johnson's posters are so called coat tail items which advocated his election along with now President Barrack [sic] Obama," (Appellants' Br. at 32), the fact that Johnson's signs included a picture of President Obama does not make Johnson's campaign a federal one to which the Twenty-Fourth Amendment would apply. But even if the Twenty-Fourth Amendment were applicable, the City's ordinance would not violate it because it does not make any voter pay any fees to vote. It instead penalizes anyone who fails to comply with its provisions. As the City points out, Appellants "confuse the imposition of a poll tax ... with the imposition of a penalty upon those who post signs on poles." (Appellee's Br. at 33.) Because there is no evidence that the City's ordinance taxed voters or otherwise made voter affluence an electoral standard, there is no issue for trial as to Appellants' Twenty-Fourth Amendment claim and the City is entitled to judgment.

## III.    Conclusion

For the foregoing reasons, we will affirm the judgment of the District Court.

---

standard." *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 666 (1966).

20