**Kenneth MCLAUGHLIN and Joshua Wood Plaintiffs,**

**v.**

**CITY OF LOWELL Defendant.**

**CIVIL ACTION NO. 14-10270-DPW**

United States District Court,
D. Massachusetts.

Signed October 23, 2015

David J. Zimmer, Goodwin Procter LLP, San Francisco, CA, Matthew Segal, American Civil Liberties Union, Corrine L. Lusic, Eric Lawson, Geoffrey Kirsch, Jenny Zhang, Kevin P. Martin, Robert D. Carroll, Goodwin Procter LLP, Sarah R. Wunsch, Aclu of Massachusetts, Boston, MA, for Plaintiffs.

C. Michael Carlson, Christine P. O'Connor, Hannah B. Pappenheim, City of Lowell Law Department, Lowell, MA, for Defendant.

## MEMORANDUM AND ORDER

DOUGLAS P. WOODLOCK, UNITED STATES DISTRICT JUDGE

The City of Lowell, Massachusetts, considers itself to have a problem with panhandling. Many officials, residents, and local stakeholders have come to believe that panhandling been becoming more common and that panhandlers have become more aggressive. In response, in 2013 the City passed an ordinance, Lowell Code § 222-15 ("the Ordinance"), to limit panhandling in the city; the Ordinance has since been amended twice. As it currently stands, the Ordinance bans all vocal panhandling in Lowell's downtown, and bans what are identified as aggressive panhandling behaviors citywide. This case presents a challenge to the Ordinance in the context of evolving case law from the Supreme Court and the First Circuit.

### I. BACKGROUND

#### A. Factual Background

Plaintiffs are two[1] homeless men who have panhandled in Lowell, requesting money that they use for, among other things, food, medicine, and shelter. They have challenged the validity of Lowell's panhandling regulations under the federal Constitution, primarily as violative of their First Amendment right to freedom of speech, but also as violative of the Due Process and Equal Protection clauses of the Fourteenth Amendment. They wish to continue asking passersby for donations in Lowell's public places and believe they have a constitutional right to do so.

The Ordinance creates two basic categories of restrictions which can be characterized as the Downtown Panhandling

---

1. A third plaintiff was dismissed from this case in July 2015 after he failed without notice to appear for his deposition and plaintiffs' counsel notified the court they had been unable to reach or communicate with him despite numerous attempts to do so.

provisions and the Aggressive Panhandling provisions. Both categories share a common definition of panhandling as the solicitation of any item of value through a request for an immediate donation. § 222-15(A). The sale of an item for an inflated amount, such that a reasonable person would understand it to be in substance a donation, also constitutes panhandling under the Ordinance. *Id.*

The Downtown Panhandling provisions were initially enacted by the Lowell City Council on November 12, 2013. These provisions ban all panhandling in the Downtown Lowell Historic District, although important exceptions exist. § 222-15(B)(1). As originally enacted, organized charities seeking donations for third parties—most iconically, the Salvation Army—were exempt and permitted to solicit in the Historic District. This exemption was removed on February 4, 2014; plaintiffs allege that was done in response to the threat of litigation. On March 3, 2015, a different exemption was inserted in the Downtown provisions, permitting panhandling that involves only "passively" standing, sitting, or performing music. *Id.* These passive panhandlers may hold a sign asking for a donation, but may not make any "vocal request" except in response to an inquiry. *Id.* These restrictions cover an extensive area—some 400 acres—which include some of the most trafficked areas in the City and a number of important government sites.

 The Aggressive Panhandling provisions were enacted on Feb. 4, 2014. These provisions prohibit panhandling "in an aggressive manner." § 222-15(B)(2). What constitutes "aggressive" panhandling is defined as any of ten activities. § 222-15(A)(1)-(10). These ten activities can be placed into three basic categories. One category includes provisions that are duplicative of existing sanctions but directed specifically at panhandling. The first provision criminalizes panhandling that is "intended or likely to cause a reasonable person to fear bodily harm to oneself," harm to another, or property damage. § 222-15(A)(1). Causing a reasonable person "to fear immediate bodily harm" is assault. *Commonwealth v. Gorassi,* 432 Mass. 244, 733 N.E.2d 106, 109–10 (2000). Accordingly, this provision creates a new offense of panhandling while committing assault. The eighth provision defining aggressive panhandling is also substantially identical to assault. § 222-15(A)(8). The third provision defining aggressive panhandling as "intentionally touching . . . without that person's consent," § 222-15(a)(8), is simply a restatement of the crime of battery, Mass. Gen. L. ch. 265 § 13A; *Commonwealth v. Burke,* 390 Mass. 480, 457 N.E.2d 622, 624 (1983), with the additional element of panhandling. The fourth provision, (§ 222-15(a)(4)), which deems aggressive panhandling that intentionally interferes with the passage of pedestrians or vehicles, appears to be duplicative, as the parties agree, of Lowell ordinances that make it illegal to "occupy or obstruct any sidewalk as to interfere with the convenient use of the same by pedestrians," § 243-20, and that regulate pedestrians entering a roadway, § 266-138. *See also* 720 C.M.R. 9.09. The fifth provision, prohibiting panhandling using violent or threatening language or gestures likely to provoke an immediate violent reaction, § 222-15(a)(5), is somewhat distinct, although I will treat it alongside these duplicative provisions because it prohibits "fighting words," a category of speech that largely falls outside the First Amendment's protections. *Chaplinsky v. State of New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (holding that the Constitution does not protect words which "tend to incite an immediate breach of the peace").

A second category of prohibited panhandling activities includes behaviors not otherwise criminal that Lowell contends are coercive panhandling techniques. There are three such provisions: continuing to panhandle from a person after that person has "given a negative response to such soliciting," § 222-15(A)(2); following a person with the intent of asking for money or things of value, § 222-15(A)(6); and panhandling in a group of two or more, in an "intimidating fashion" § 222-15(A)(9).

In a final category of panhandling activities, Lowell has deemed all panhandling performed in certain locations to be illegal aggressive panhandling. Panhandling from anyone who is waiting in line is banned. § 222-15(A)(7). Additionally, any panhandling within a twenty feet buffer zone around a bank, ATM, check-cashing business, mass transportation facility, public restroom, pay telephone, theater, or outdoor seating area, or around the parking lot for any of those facilities, is banned. § 222-15(A)(10).

There is no passive sign holding exception for the Aggressive Panhandling provisions; as a consequence, even sitting and holding a sign asking for donations is prohibited in these locations. Originally, the Aggressive Panhandling provisions only applied in the Downtown Lowell Historic District, but they were extended citywide on March 3, 2015.

Plaintiffs have regularly panhandled in Lowell, including in the Downtown Historic District. Neither considers himself ever to have panhandled aggressively, although they concede it is possible that they have panhandled in what are prohibited locations under the Ordinance. They have stated that, since the Ordinance was passed, they have avoided panhandling downtown because they have been afraid of arrest. They seek a declaration that the Lowell panhandling ordinance is unconstitutional and a permanent injunction against its enforcement.

### B. Procedural History and Standard of Review

No part of the Ordinance has yet been enforced. Plaintiffs filed for a preliminary injunction when filing their complaint in February, 2014, but their motion for interlocutory injunctive relief was rendered moot by Lowell's agreement to forbear from enforcement until the case was decided on the merits. Meanwhile, while governing case law has evolved, the City has considered refinements to the Ordinance. The current iteration of the Ordinance is the one which the City has chosen to defend. The parties have conducted discovery and have filed cross-motions for summary judgment regarding the current iteration of the Ordinance.

Under Rule 56, I may grant summary judgment only if there is no genuine dispute of material fact and if the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Carmona* v. *Toledo*, 215 F.3d 124, 132 (1st Cir.2000). Cross-motions for summary judgment "do not alter the basic Rule 56 standard." *Adria Int'l Grp., Inc* v. *Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir.2001). Rather, I must assess each motion for summary judgment independently and "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Id.* Because this is a facial attack on the constitutionality of a municipal ordinance, I find no material factual disputes and am able to decide the case on the basis of uncontested facts.

## II. ANALYSIS

### A. Panhandling as Protected Speech under the First Amendment

 Panhandling, as defined by the Ordinance, is expressive activity within the

scope of the First Amendment. Solicitations of money by organized charities are "within the protection of the First Amendment." *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). *See also Williams–Yulee v. Florida Bar*, —— U.S. ——, 135 S.Ct. 1656, 1664, 191 L.Ed.2d 570 (2015) ("We have applied exacting scrutiny to laws restricting the solicitation of contributions to charity"). This protection extends to those soliciting funds on their own behalf. People who panhandle "may communicate important political or social messages in their appeals for money, explaining their conditions related to veteran status, homelessness, unemployment and disability, to name a few." *Gresham v. Peterson*, 225 F.3d 899, 904 (7th Cir.2000). Plainly, a sign reading "Sober," or "Two children," conveys a message about who is deserving of charitable support, just as a sign reading "God bless," expresses a religious message.

Panhandling is an expressive act regardless of what words, if any, a panhandler speaks. Even "the presence of an unkempt and disheveled person holding out his or her hand or a cup to receive a donation itself conveys a message of need for support and assistance." *Loper v. New York City Police Dep't*, 999 F.2d 699, 704 (2d Cir.1993). Courts have consistently recognized the protected, expressive nature of panhandling. *See, e.g., Speet v. Schuette*, 726 F.3d 867, 875 (6th Cir.2013) ("begging is a form of solicitation that the First Amendment protects"); *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 553 (4th Cir.2013) ("the speech and expressive conduct that comprise begging merit First Amendment protection"); *Smith v. City of Fort Lauderdale, Fla.*, 177 F.3d 954, 956 (11th Cir.1999). Panhandling is not merely a minor, instrumental act of expression. In the words of the Massachusetts Supreme Judicial Court, at stake is "the right to engage fellow human beings with the hope of receiving aid and compassion." *Benefit v. City of Cambridge*, 424 Mass. 918, 679 N.E.2d 184, 190 (1997).

Lowell casts its argument that "modern" panhandling lacks the expressive quality deserving protection in language that demonstrates the opposite. The City contends that the panhandlers of today are not the "lone needy person" whose acts might "keep the issues of poverty and/or homelessness in the public eye." Rather, it claims, they represent a "raucous alternative culture," both "festive and sinister," engaged in "a war on the public sentiment."[2] Whether or not there has been a transformation of the culture of panhandling, the raucous presentation of the visions of alternative cultures in the public sphere is at the heart of the First Amendment. *Cf. Schaumburg*, 444 U.S. at 632, 100 S.Ct. 826. The First Amendment clearly limits how panhandling may be regulated.

### B. The Downtown Panhandling Provisions

#### 1. The Downtown Panhandling Ban and Strict Scrutiny

 The Downtown Panhandling provisions regulate speech in public fora,

---

**2.** This language is deployed at the outset in the City's memorandum of law in support of its motion for summary judgment, p. 1-4. In addition to demonstrating the expressive value of panhandling, the City's fervent denunciation of the culture of panhandling also evidences the City's content-based intent in enacting the Ordinance. As demonstrated below, however, I find the Ordinance to be content-based on its face and do not need to turn to issues of intent. If required to address intent, I would easily conclude that the City's prohibition of panhandling was specifically intended to restrict the speech and expressive context of begging that is within First Amendment protection.

where the government's power to regulate speech is most constrained. Sidewalks and parks, both of which are covered by the Downtown provisions, are quintessential public fora. *Cutting* v. *City of Portland, Me.*, 802 F.3d 79, 83–84 (1st Cir.2015). In public fora, a regulation is subject to stricter scrutiny if it is content-based than if it is a content-neutral time, place or manner regulation, because a content-based regulation "raises a very serious concern that the government is using its power to tilt public debate in a direction of its choosing." *Id.* at 84.

▇ As explained in the Supreme Court's opinion last term in *Reed* v. *Town of Gilbert, Ariz.*, —— U.S. ——, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015), a court must determine whether a law is content-based "on its face," based on whether it "applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 2227. A law "targeted at specific subject matter is content-based even if it does not discriminate among viewpoints within that subject matter." *Id.* at 2230. If a law is content-based on its

face, it is immaterial whether the government had a "benign motive, content-neutral justification, or 'lack of animus toward the ideas contained' in the regulated speech." *Id.* at 2228 (citing *Cincinnati* v. *Discovery Network, Inc.*, 507 U.S. 410, 429, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993)).

▇ The Downtown provisions are plainly content-based under current Supreme Court guidance. On its face, the Ordinance distinguishes solicitations for immediate donations from all others. A person could vocally request that passersby in the Historic District make a donation tomorrow, but not today (a distinction that may be of great import to someone seeking a meal and a bed tonight). He could ask passersby to sign a petition, but not a check. The City's definition of panhandling targets a particular form of expressive speech—the solicitation of immediate charitable donations—d applies its regulatory scheme only to that subject matter.

*Reed* makes earlier cases, which had split over what forms of regulation of panhandling were content-based, of limited continuing relevance.[3] The Seventh Circuit

---

3. *Compare Clatterbuck* v. *City of Charlottesville*, 708 F.3d 549, 556 (4th Cir.2013) (finding a ban on requests for immediate donations content-based) with *ISKCON of Potomac, Inc.* v. *Kennedy*, 61 F.3d 949 (D.C.Cir.1995) (finding such a ban content-neutral). To the extent that *United States* v. *Kokinda*, 497 U.S. 720, 730, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) and *International Society for Krishna Consciousness, Inc.* v. *Lee*, 505 U.S. 672, 678, 112 S.Ct. 2711, 120 L.Ed.2d 541 (1992), involving limitations on solicitations in *non-public* fora, might have been thought applicable to this case, they are refined by *Reed*. Justice Kennedy's concurrence in *Lee* deserves additional mention, given the City's heavy reliance on it in the briefing now before me. Justice Kennedy wrote that a regulation prohibiting the solicitation of an immediate donation was constitutional and not content-based, because it prohibited only conduct rather than expression and because such solicitation

carried with it a "risk of fraud and duress." *Id.* at 704–05, 112 S.Ct. 2711. I find the Sixth Circuit's decision not to follow this concurrence, which itself was drafted before *Reed*, persuasive:

> We decline to follow the reasoning in Part II of Justice Kennedy's concurrence in Lee for three reasons. First, to the extent that Part II of Justice Kennedy's concurrence argues that the "physical exchange of money" may be isolated from the act of solicitation, it runs contrary to *Schaumburg*'s holding that solicitation of charitable donations is "characteristically intertwined with informative and perhaps persuasive speech[.]" *Schaumburg*, 444 U.S. at 632, 100 S.Ct. 826. *Schaumburg* does not suggest that the physical exchange of money may be isolated; it is "intertwined" with speech that the First Amendment protects. Second, Part II of Justice Kennedy's concurrence is not *Lee*'s holding. And third, Justice Kennedy

recognized this in litigation concerning a very similar ban on panhandling in the downtown historic district of Springfield, Illinois. *Norton* v. *City of Springfield, Ill.,* 768 F.3d 713 (7th Cir.2014) *on reh'g,* No. 13–3581, 612 Fed.Appx. 386, 2015 WL 4714073 (7th Cir. Aug. 7, 2015).[4] Before *Reed,* the court had held that the ban was content-neutral, on the grounds that it did not burden particular ideas or viewpoints. In the wake of *Reed,* the same panel reversed itself, holding that *Reed* required a finding that the ordinance is content-based on its face. That outcome is equally applicable here.[5]

While *Reed* may prove to refine First Amendment law materially, I find the Ordinance content-based for additional reasons based on other recent Supreme Court precedent. The Court has held that a regulation is content-based if it requires "en-

forcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen* v. *Coakley,* —— U.S. ——, 134 S.Ct. 2518, 2531, 189 L.Ed.2d 502 (2014) (quoting *F.C.C.* v. *League of Women Voters of California,* 468 U.S. 364, 383, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984)). This test reinforces the conclusion that Lowell's Downtown panhandling provisions are content-based regulations. Under the provisions, a police officer would have to listen to a person's solicitation and determine whether he was asking for an immediate donation before finding a violation. Moreover, this inquiry into content would always be necessary. Even where a person was sitting in the Historic District with a sign reading "Hungry and homeless" and speaking to every stranger who walked by, the police officer would still have to deter-

wrote Part II without another Justice joining him.

*Speet* v. *Schuette,* 726 F.3d 867, 876 (2013). Justice Kennedy's concurrence in *Lee* was, of course, not binding when written and has become less persuasive since *Reed.* It appears at this point clear that regulations of solicitation which single out the solicitation of the *immediate transfer of funds for charitable purposes* are content-based.

4. The Springfield ordinance, like Lowell's, prohibited oral requests for immediate donations of money, while allowing signs requesting money or requests to send money later. *Norton* v. *City of Springfield, Ill.,* 768 F.3d 713, 714 (7th Cir.2014) *on reh'g,* No. 13–3581, 612 Fed.Appx. 386, 2015 WL 4714073 (7th Cir. Aug. 7, 2015).

5. I note, in the wake of *Reed,* the Supreme Court also vacated the First Circuit's decision in *Thayer* v. *City of Worcester,* 755 F.3d 60 (2014), a case concerning an anti-panhandling ordinance in Worcester, Massachusetts. The First Circuit had found the ordinance to be content-neutral, but the Supreme Court remanded that decision "for further consideration in light of *Reed.*" *Thayer* v. *City of Worcester, Mass.,* —— U.S. ——, 135 S.Ct. 2887, 192 L.Ed.2d 918

(2015). This disposition does not necessarily mean *Reed* requires a different outcome, but it does speak to the relevance of *Reed* in a case such as this one. Such an order summarily granting a petition for *certiorari,* vacating the decisions and remanding the case is not a "final determination on the merits," but rather "simply indicate[s] that, in light of 'intervening developments,' there [is] a 'reasonable probability' that the Court of Appeals would reject a legal premise on which it relied and which may affect the outcome of the litigation." *Tyler* v. *Cain,* 533 U.S. 656, 666 n. 6, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001) (citing *Henry* v. *Rock Hill,* 376 U.S. 776, 777, 84 S.Ct. 1042, 12 L.Ed.2d 79 (1964) (per curiam) and *Lawrence* v. *Chater,* 516 U.S. 163, 167, 116 S.Ct. 604, 133 L.Ed.2d 545 (1996) (per curiam)). Thus, while the Supreme Court's action in *Thayer* does not require me to find that this ordinance is content-based, it does clarify that *Reed,* and not earlier cases concerning the regulation of solicitation, must be the starting point for the inquiry. As of this date, *Thayer* remains under advisement before Judge Hillman to whom the First Circuit ordered further remand. *Thayer* v. *City of Worcester,* No. 13-cv-40057 (D. Mass.) (*see* CM/ECF No. 106, Jul. 14, 2015)

mine whether those conversations were prohibited "vocal request[s]" for money. Neither a pleasant "good morning" nor an aggressive political diatribe unrelated to a solicitation would be impermissible, while a "please give," or an "I'm a veteran" would be. The Downtown panhandling provisions are thus content-based not only linguistically but also in their invitation to content-based enforcement choices.

As a point of comparison, the First Circuit recently declared a Portland, Maine ordinance banning standing or sitting on median strips to be content-neutral. *Cutting*, 802 F.3d at 85. Although that ordinance had only been enforced against panhandlers, *id.* at 82, it was facially content-neutral: no message could be expressed from a median strip, whether a request for money or political advocacy. While the enforcement of the ordinance may have been content-based, the court found, the statute itself restricted speech "only on the basis of where such speech takes place." *Id.* at 85. Lowell's ordinance, on its face, goes further and eschews such neutrality; the Ordinance applies only to requests for the immediate donation of money. Unlike the ordinance in *Cutting* (which was nevertheless struck down for violating the First Amendment), Lowell's ordinance is subject to the most searching scrutiny.

 Lowell argues that its ordinance can escape being treated as content-based pursuant to the "secondary effects" doctrine. Under this doctrine, zoning ordinances meant to address not the content of adult establishments but effects on crime, property values and other neighborhood characteristics can be evaluated as content-neutral regulations. *City of Los Angeles* v. *Alameda Books, Inc.*, 535 U.S. 425,

434, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (plurality opinion) (O'Connor, J.). To justify an ordinance on these grounds, however, a government must provide evidence—something better than "shoddy data"—demonstrating the effect of the speech regulation on those secondary effects. *Id.* at 438, 122 S.Ct. 1728. This doctrine does not justify Lowell's ordinance. Even putting aside the issue whether the doctrine applies at all outside the zoning context, *id.* at 448-49, 122 S.Ct. 1728 (Kennedy, J., concurring), Lowell has not provided the kind of reliable data needed to show that it is truly targeting secondary effects. More importantly, it is at least substantially, if not exclusively, targeting the content of panhandlers' speech, not any secondary effects that follow. *Cf. McCullen*, 134 S.Ct. at 2531–32 ("the Act would not be content neutral if it were concerned with undesirable effects that arise from 'the direct impact of speech on its audience.' "). Although the City floats the idea that panhandling contributes to a larger decline in police efficacy and public participation, it provides no meaningful evidence-based support for that contention. The City is primarily concerned with panhandlers' direct behavior: that panhandlers ask for money in numbers deemed too large, in locations too sensitive or in manners too aggressive. The secondary effects doctrine is entirely inapplicable to the Ordinance.

### 2. No Compelling Interest Supports the Downtown Ban

 Because the Downtown provisions are content-based, they "must be the least restrictive means of achieving a compelling state interest." *McCullen* v. *Coakley*, —— U.S. ——,134 S.Ct. 2518, 2530, 189 L.Ed.2d 502 (2014).[6] This is an exacting

---

**6.** In *Reed,* Justice Thomas framed the standard for strict scrutiny somewhat differently, as requiring "the Government to prove that

the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed* v. *Town of Gilbert, Ariz.,* —— U.S.

standard. Content-based regulations are "presumptively invalid," *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), and it is the "rare case" in which strict scrutiny is overcome, *Williams–Yulee* v. *Florida Bar*, —— U.S. ——, 135 S.Ct. 1656, 1665, 191 L.Ed.2d 570 (2015).

 Strict scrutiny analysis of content-based regulation begins by identifying the compelling interest to which a regulation must be tailored. The interests originally pursued by the City of Lowell when it enacted the Downtown provisions—tourism and economic development—are set forth in the preamble to the Ordinance:

Tourism is one of Lowell's most important economic industries; and

The Downtown Historic District is essential for the Lowell tourism experience; and

The City has a compelling interest in providing a safe, pleasant environment and eliminating nuisance activity within the Downtown Historic District; and So-

——, 135 S.Ct. 2218, 2231, 192 L.Ed.2d 236 (2015). In *McCullen*, Chief Justice Roberts distinguished the "least restrictive means" standard from the arguably more permissive "narrowly tailored" standard:

"For a content-neutral time, place, or manner regulation to be narrowly tailored, it must not burden substantially more speech than is necessary to further the government's legitimate interests. Such a regulation, unlike a content-based restriction of speech, need not be the least restrictive or least intrusive means of serving the government's interests. But the government still may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals."

*McCullen* v. *Coakley*, —— U.S. ——, 134 S.Ct. 2518, 2535, 189 L.Ed.2d 502 (2014) (internal citations omitted). The *McCullen* formulation appears more precise, but *Reed* is chronologically the last word on the subject. Over the years, the Supreme Court has not always distinguished between the two formulations. *See,*

licitation, begging or panhandling substantially burdens tourism within the Downtown Historic District.

 Fostering economic revitalization in a challenging urban area like Lowell is undoubtedly a critical task for city policymakers and may rise to the level of a significant, indeed a substantial, government interest sufficient to justify content-neutral regulations. *See Smith* v. *City of Fort Lauderdale, Fla.*, 177 F.3d 954, 956 (11th Cir.1999) (promoting tourism and providing a "safe, pleasant environment" conceded by parties to be significant government interests); *Edwards* v. *D.C.*, 755 F.3d 996, 1002–03 (D.C.Cir.2014) (the protection of the tourism industry is "undoubtedly" a "substantial government interest"). A vibrant downtown economy can help provide jobs to the unemployed, reduce crime and improve public safety, and provide tax revenue for essential public services, including those that help the homeless and other panhandlers.[7]

*e.g., United States* v. *Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) ("If a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest. If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative."). As a consequence, it is not only somewhat unclear which standard governs, but precisely what those standards mean relative to each other. Nevertheless, *McCullen* appears to lay out the contours of the tiers of scrutiny under the First Amendment. *See also Cutting*, 802 F.3d at 84 (1st Cir.2015) (distinguishing the "least restrictive means" test for strict scrutiny of content-based regulations and the "narrowly tailored" test for content-neutral regulations).

7. Plaintiffs assert that the City failed to establish that panhandling actually harmed business or tourism downtown, arguing that the City's evidence amounts to anecdotes and hearsay. The City bears the burden of showing that the harms it seeks to mitigate "are

■ However, the promotion of tourism and business has never been found to be a compelling government interest for the purposes of the First Amendment. *See Pottinger v. City of Miami*, 810 F.Supp. 1551, 1581 (S.D.Fla.1992) ("the City's interest in promoting tourism and business and in developing the downtown area are at most substantial, rather than compelling, interests"). I cannot conclude that tourism promotion is a sufficiently important interest to allow content-based restrictions on speech affecting it to survive strict scrutiny. Such a conclusion would permit a highly open textured and inadequately developed justification to eviscerate limitations on content-based speech regulation.[8]

The mechanism by which Lowell's ban on panhandling downtown would promote tourism flies in the face of the First Amendment. The First Amendment does not permit a city to cater to the preference of one group, in this case tourists or downtown shoppers, to avoid the expressive acts of others, in this case panhandlers, simply on the basis that the privileged group does not like what is being expressed. It is core First Amendment teaching that on streets and sidewalks a person might be "confronted with an uncomfortable message" that they cannot avoid; this "is a virtue, not a vice." *McCullen*, 134 S.Ct. at 2529. Just as speech cannot be burdened "because it might offend a hostile mob," *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 135, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992), it cannot be burdened because it would discomfort comparatively more comfortable segments of society.

For First Amendment purposes, economic revitalization might be important, but it does not allow the sensibilities of

---

real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 18 (1st Cir.2007) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 644, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (plurality opinion)). In this regard, the courts owe "substantial deference" to a legislature's predictions about the effect of its policies, given its institutional capacity to gather information and the fact that it is not obligated to prepare that information into record form. *Turner Broad. Sys.*, 512 U.S. at 665–66, 114 S.Ct. 2445. At the summary judgment stage, I would be hesitant to hold that the legislature lacked a sufficient basis to believe that panhandling was impeding the downtown economy, even without rigorous data collection or analysis, where it conducted a public hearing and heard from stakeholders. In any event, because I hold that tourism and business promotion are not compelling government interests, I do not need to decide definitively the issue whether the evidence supporting harm to business or tourism downtown by panhandling is sufficient.

8. Even if the promotion of business and tourism were a compelling government interest, the Downtown provisions are hardly the least restrictive means of promoting them. The restrictions have a large geographic sweep, covering essentially all of downtown Lowell, including the most trafficked areas where panhandlers could reach the most people. *See Cutting*, 802 F.3d at 89 (noting that the challenged ordinance encompassed a large number of spaces, including those that were most useful for plaintiffs' speech). And they flatly ban all vocal requests for money. *See Frisby v. Schultz*, 487 U.S. 474, 485, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) ("A complete ban can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil."). I do not reach the issue of tailoring because I conclude there is no compelling interest against which the Downtown Panhandling provisions are to be measured. Nevertheless, it is apparent that the challenge of establishing a broad undifferentiated geographic (except for the label "Historic District") prohibition as the least restrictive means available would be an all but insurmountable hurdle for the City. Moreover, as the discussion in section II.C. of the Aggressive Panhandling provisions makes clear, the City has not surmounted that hurdle with its more narrowly defined approach to aggressive panhandling.

some to trump the speech rights of others. *See also Roulette* v. *City of Seattle*, 97 F.3d 300, 308–09 (9th Cir.1996), *as amended on denial of reh'g and reh'g en banc* (Sept. 17, 1996) (Pregerson, J., dissenting) ("Seattle seeks economic preservation by ridding itself of social undesirables... a less than compelling governmental interest"); *Am. Civil Liberties Union of Idaho, Inc.* v. *City of Boise*, 998 F.Supp.2d 908, 917 (D.Idaho 2014) ("Business owners and residents simply not liking panhandlers in acknowledged public areas does not rise to a significant governmental interest."); *Benefit* v. *City of Cambridge*, 679 N.E.2d at 190 ("A listener's annoyance or offense at a particular type of communicative activity does not provide a basis for a law burdening that activity").

The City also suggests that the Downtown provisions serve the compelling government interest of public safety, arguing both that promoting public safety is an independent purpose of the Ordinance and that it is a mechanism by which the Ordinance promotes tourism and business. Plaintiffs do not contest that protecting public safety and preventing coercion are compelling government interests. However, public safety serves as a post-hoc rationalization for the Downtown provisions. The purpose of the ordinance was authoritatively set forth in its preamble, quoted above, which was duly enacted by the City Council along with the Ordinance. It is undisputed that only tourism and nuisance abatement (with a passing reference to an associated "safe" environment) were included in that original preamble.

There is a dispute between the parties whether later depositions established public safety as an additional reason for the Ordinance. That dispute, however, is immaterial, because after-the-fact explanations cannot help a law survive strict scrutiny. This principle is firmly established for strict and even intermediate scrutiny under the Equal Protection Clause. *Shaw* v. *Hunt*, 517 U.S. 899, 908 n. 4, 116 S.Ct. 1894, 135 L.Ed.2d 207 (U.S. 1996) (For strict scrutiny on the basis of racial classifications, "[t]o be a compelling interest, the State must show that the alleged objective was the legislature's 'actual purpose' for the discriminatory classification, and the legislature must have had a strong basis in evidence to support that justification.") (internal citations omitted); *United States* v. *Virginia*, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (For intermediate scrutiny on the basis of gender, "[t]he justification must be genuine, not hypothesized or invented post hoc in response to litigation."). The principle has also been extended to the First Amendment context. *Russell* v. *Lundergan–Grimes*, 784 F.3d 1037, 1052 (6th Cir. 2015); *see also Yellowbear* v. *Lampert*, 741 F.3d 48, 59 (10th Cir.2014) (in RLUIPA context, where Congress "borrowed its language from First Amendment cases" applying strict scrutiny, "post-hoc rationalizations" cannot prove a compelling interest). The City, having officially put forward its reasons for the Downtown Panhandling provisions, cannot add to those reasons in litigation. The Downtown Panhandling provisions were passed to promote tourism, not public safety as such, and consequently do not further a compelling state interest.[9]

9. Even if public safety were a reason for the Downtown Panhandling provisions, strict scrutiny still would not be satisfied. The Downtown panhandling provisions are not close to the least restrictive means necessary to promote public safety—likely because they were never intended to serve that purpose. The Downtown Panhandling provisions ban all vocal requests for money, regardless of whether they are aggressive or not. A Salvation Army member who briefly stopped ringing his bell and instead asked for money

They therefore cannot survive strict scrutiny under the First Amendment.

### C. Aggressive Panhandling

#### 1. The Aggressive Panhandling Ban and Strict Scrutiny

 The Aggressive Panhandling provisions are governed by the same First Amendment framework as are the Downtown Panhandling provisions. The Aggressive Panhandling provisions regulate expressive conduct that is protected by the First Amendment. An aggressive, perhaps disconcerting and indeed frightening, panhandler still conveys messages related to need and deprivation or, in the City's characterization, about the alternative lifestyle of panhandling. And as with the Downtown provisions, these are content-based regulations of activity in public fora. The same definition of "panhandling" is employed in both, regulating only requests for immediate donations. As noted in the discussion of the Downtown Panhandling provisions in Section II.B. above, this definition, on its face, distinguishes between some solicitations and others based on the content of that solicitation. A person following someone to ask for a donation would be treated as illegally panhandling under the Aggressive Panhandling provisions, whereas someone following another asking for a petition signature would be permitted to continue exercising such a right to political expression. As content-based regulation, the Aggressive Panhandling provisions must be the least restrictive means for achieving a compelling state interest.

Unlike the Downtown Panhandling provisions, however, the Aggressive Panhandling provisions were enacted in furtherance of a compelling state interest: public safety. Plaintiffs do not contest that preventing "truly aggressive behavior," such as unwanted touching, is a compelling interest. Nor could they: public safety is "the heart of government's function." *Houston Chronicle Pub. Co.* v. *City of League City, Tex.*, 488 F.3d 613, 622 (5th Cir.2007). Given the existence of a compelling state interest, the question is whether the Aggressive Panhandling provisions are properly fashioned.

Plaintiffs offer a number of arguments as to why the Aggressive Panhandling provisions are not the least restrictive means available for achieving the goal of public safety. I address at the threshold one which applies to the provisions generally. Plaintiffs assert that Lowell has failed to try a less speech-restrictive alternative—better enforcing existing laws, such as disorderly conduct or assault—before enacting the Aggressive Panhandling Ordinances. Under *McCullen*, the justification for a restriction on speech cannot simply allege without evidence that other approaches "do not work," nor is it enough to say that a speech restriction would be easier to enforce. *McCullen*, 134 S.Ct. at 2539–40. Plaintiffs accordingly argue that the City needs to show the failure of a stepped-up approach to the enforcement of existing laws before it could constitutionally enact an anti-panhandling ordinance.

 *McCullen*, however, does not require Lowell to have exhausted every en-

---

verbally would be violating the Downtown Panhandling provisions, as would a panhandler who never raised her voice or lifted a hand. An ordinance which prohibits these people from soliciting donations, although they pose no recognized threat to public safety, is not narrowly tailored to the goal of public safety, much less the least restrictive

means available to achieve that goal. Indeed, the subsequent enactment of the Aggressive Panhandling provisions clearly illustrates the mismatch between the Downtown Panhandling provisions and any public safety objectives: when concerned about public safety, Lowell addressed entirely different behaviors.

forcement strategy and demonstrated failure before passing the Ordinance. Rather, the City must "demonstrate that alternative measures that burden substantially less speech would fail to achieve the government interests." *Id.* at 2540. They may accomplish this either by trying or "adequately explain[ing] why it did not try" alternative approaches, *Cutting*, 802 F.3d at 91. In *McCullen*, the Court noted that Massachusetts had not identified a single prosecution brought under alternative laws in 17 years or any injunction issued since the 1990s. *McCullen*, 134 S.Ct. at 2539. Here, in contrast, plaintiffs concede that the Lowell Police Department responded to 827 calls coded as related to "panhandling/begging" over a period of three years and three months, applying existing laws in each case. While plaintiffs contest which of these calls actually concerned panhandling or actually required additional enforcement tools,[10] it is clear that the City, unlike the authorities in *McCullen*, has attempted to use existing enforcement techniques and yet still plausibly contends that it has a public safety problem. In *Cutting*, the First Circuit responded to the city's claim that existing laws were inadequate not by requiring additional enforcement, but by suggesting more targeted forms of new legislation. *Cutting*, 802 F.3d at 92–93. Lowell is free to try new approaches to protecting public safety, including by passing an ordinance prohibiting aggressive panhandling, so long as that ordinance satisfies the requirements of the First Amendment. I turn to the ten forms of "aggressive panhandling" it has to date identified to determine whether any or all can survive strict scrutiny.

I begin with the duplicative provisions of the definition of aggressive panhandling, and in particular with the ban on panhandling while using fighting words, § 222-15(A)(5). That provision is unconstitutional under the express holding of *R.A.V.* v. *City of St. Paul, Minn.*, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). There, the Court considered a hate crimes ordinance which prohibited the display of a symbol that amounted to fighting words and which incited violence on the basis of race, religion, or gender. *Id.* at 380–81, 112 S.Ct. 2538. Although fighting words themselves are not protected by the First Amendment, *Chaplinsky*, 315 U.S. at 572, 62 S.Ct. 766, the Court nevertheless found the ordinance in question violated the First Amendment. As the Court explained, a municipality's power to ban speech "on the basis of *one* content element (*e.g.,* obscenity) does not entail the power to proscribe it on the basis of *other* content elements." *R.A.V.*, 505 U.S. at 386, 112 S.Ct. 2538. By banning only certain fighting words, on the basis of a separate form of content-based discrimination, the ordinance unconstitutionally "impose[d] special prohibitions on those speakers who express views on disfavored subjects." *Id.* at 391, 112 S.Ct. 2538. So too, here. The City unquestionably has the power to regulate fighting words, but it may not create a special ban on fighting words uttered in connection with the protected speech of panhandling. "Selectivity of this sort creates the possibility," indeed, more than a mere possibility in the case of Lowell's ordinance, "that the city is seeking to handicap the expression of particular ideas." *Id.* at 394, 112 S.Ct. 2538.

10. Plaintiffs contend that only 18 out of 827 phone calls could not be covered by existing laws and that therefore the Aggressive Panhandling provisions are an overreaction to a very small public safety problem. I simply note these numbers are contested without finding it necessary to resolve the dispute with precision.

■ The reasoning of *R.A.V.* extends beyond its direct application to fighting words and governs the other duplicative provisions, see § 222-15(A)(1),(3),(4),(8). Like panhandling banned under the Ordinance because it is also an assault or a battery, the behavior at issue in *R.A.V.* could have been punished under other, generally applicable criminal laws. *Id.* at 379–80. *R.A.V.* instructs that where a law prohibits behavior on the basis of expressive content—even if the underlying behavior may be prohibited constitutionally or already is prohibited—the decision to create an *additional* content-based prohibition must satisfy strict scrutiny. *Id.* at 395–96, 112 S.Ct. 2538 (identifying as "dispositive" whether "content discrimination" is necessary to achieve the city's interests). The Ordinance gives Lowell law enforcement officials the option to seek an additional penalty on a panhandler who commits assault or obstructs the sidewalk, one which might be exercised in addition to existing laws or instead of them. It subjects those who assault while engaged in particular expressive acts to increased liability, whether in the form of stacked penalties or more flexibility, and hence more negotiating leverage, for law enforcement officials in their charging decisions.

The City has not demonstrated that public safety requires harsher punishments for panhandlers than others who commit assault or battery or other crimes. To the contrary, in its briefing the City justified these duplicative provisions on the grounds that they provide "a useful clarifying function for both the public and panhandlers," and serve a "hortatory function." *R.A.V.* specifically rejected such communicative justifications for content-specific criminal laws. The Court there addressed St. Paul's argument that "displaying the city council's special hostility" to the speech "singled out" could justify that ordinance, observing "[t]hat is precisely what the First Amendment forbids." *Id.* at 396, 112 S.Ct. 2538. The City may not deem criminal activity worse because it is conducted in combination with protected speech, and it certainly may not do so in order to send a message of public disapproval of that speech on content based grounds.

Next, I turn to the second category of actions that the Ordinance deems aggressive panhandling: those that constitute non-criminal, allegedly coercive behaviors. Specifically, these are continuing to panhandle from an individual who has already given a negative response to solicitations, § 222-15(A)(2), following a person with the intent of asking them for money, § 222-15(A)(6), and panhandling in a group of two or more in an "intimidating" manner, § 222-15(A)(9).

■ The bans on following a person and panhandling after a person has given a negative response are not the least restrictive means available, for similar reasons. A panhandler who asks for change from a passerby might, after a rejection, seek to explain that the change is needed because she is unemployed or state that she will use it to buy food. These additional post-rejection messages do not necessarily threaten public safety; their explanations of the nature of poverty sit at the heart of what makes panhandling protected expressive conduct in the first place. Likewise, a panhandler might follow someone in order to convey a longer message. Both behaviors might be utilized where a promising target—someone who might want to hear a panhandler's message—walks by a panhandler without noticing him at all. If panhandling is truly valuable expressive speech, then panhandlers may have a right to more than one shot at getting their message across.

Of course, a panhandler who refuses to leave someone alone after a clear rejection and who then follows that person over a great distance, perhaps to their car or past less-trafficked alleyways, might be a very real threat to public safety. But a less restrictive ordinance could target such threatening behaviors. Without suggesting that such approaches would in fact pass constitutional muster, *see Cutting*, 802 F.3d at 93, I note that an ordinance could give panhandlers some period of time or distance to follow people; it could require multiple or unequivocal statements that a person will specifically not donate rather than a mere "negative response;" or it could add a requirement that the behavior be intended to and, in fact, does harass or be perceived by a reasonable person as harassing. Other less restrictive means may also be available. In any event, giving panhandlers only one chance to convey their message, without following or following-up, is more restrictive than necessary. Defining these two behaviors as illegal aggressive panhandling fails to satisfy the least restrictive tailoring requirements of strict scrutiny of content-based regulations.

 As for the prohibition on panhandling in a group of two or more in an intimidating manner, § 222-5(A)(9), it is difficult to know even what it is that is proscribed; "intimidating" is left undefined. Perhaps the most plausible limiting interpretation of this provision is that "intimidating" group panhandling is that which rises to the level of assault, disorderly conduct, or some other conventionally illegal activity. Under this interpretation, however, the analysis concerning duplicative provisions, as developed above, governs and a ban would violate the First Amendment. An alternative interpretation in which "intimidating" was not merely duplicative would restrict more speech and require a stronger justification still.

 Moreover, under any definition of "intimidating," this provision singles out for punishment expression conducted by multiple people rather than alone. Burdening the expression of those who join their voices together infringes upon not only the First Amendment's protection of speech, but also of assembly. *Coates* v. *City of Cincinnati*, 402 U.S. 611, 615, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) (ordinance that prohibited three or more people assembling and behaving in "a manner annoying to persons passing by" unconstitutional due to vagueness, but also because it "violates the constitutional right of free assembly and association.").[11] Just as a city could not tell a pair of Mormon missionaries that they must knock on doors alone

11. As the reference to *Coates* demonstrates, this provision—like others in the Ordinance—raises serious due process concerns. A statute is void for vagueness and violates the Due Process Clause of the Constitution if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States* v. *Williams*, 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008). Where expression protected by the First Amendment might be limited, there is a heightened requirement for specificity. *Smith* v. *Goguen*, 415 U.S. 566, 573, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). While many of the Lowell Aggressive Panhandling provisions appear adequately defined, some are worrisomely vague, none more so than the prohibition on groups panhandling in an "intimidating" manner. Moreover, the history of the Ordinance raises the specter of discriminatory enforcement stilling or chilling the voices of homeless panhandlers, as opposed to organized charities.

Nevertheless, I recognize that the void-for-vagueness doctrine is notoriously ill-defined. *See The Void-for-Vagueness Doctrine In the Supreme Court*, 109 U. PA. L. REV. 67, 70 (1960) ("What gives these decisions their pool-rack-hung-up appearance is their almost habitual lack of informing reasoning"); John Calvin Jeffries, Jr., *Legality, Vagueness, and the Construction of Penal Statutes*, 71 VA. L.

(much less tell only missionaries but not other door-to-door solicitors to work alone), Lowell may not forbid panhandlers whose activity is otherwise permissible from expressing themselves together without satisfying strict scrutiny. In the absence of record evidence that panhandling in a group of two or more is a greater threat to public safety than panhandling alone—or that "intimidating" group panhandling is more dangerous than "intimidating" solo panhandling—such scrutiny cannot be satisfied.

█ The third category of "aggressive panhandling" provisions defines all panhandling in certain locations as aggressive and therefore prohibited. Panhandling from anyone waiting in line is considered aggressive. § 222-15(A)(7). Also prohibited is all panhandling within a 20 foot buffer zone surrounding the following locations: a bank, an ATM, a check-cashing business, a transit stop, a public restroom, a pay telephone, a theater, or any outdoor seating, as well as any parking area associated with these facilities. § 222-15(A)(10). In delineating these locations as closed off for panhandling, the City fails to use the least restrictive means available for protecting public safety. The locations where the City has prohibited panhandling are divided between those, like a bus stop or a line, where people are essentially captive audiences for panhandlers, and those, like near ATMs or public restrooms, where there is an elevated risk or fear of physical harm. The first set is not tailored to public safety at all; while it may be more bothersome, and even in some sense more coercive, for a person to be panhandled when they cannot, or find it difficult to leave, it is not demonstrably more dangerous.[12]

In contrast, those at a public restroom or in a parking lot might reasonably feel particularly vulnerable physically and those withdrawing money from an ATM might be at higher risk of being robbed or threatened. Restricting panhandling in those locations might satisfy the narrow tailoring requirement for content-neutral regulations. See, e.g., Gresham, 225 F.3d at 906. Yet they are not the least restrictive means available to protect public safety. It is undisputed that these provisions prevent any solicitation of funds in these locations, even the silent and passive holding of a sign. And while the City claims that the choice to hold a sign near an ATM is "however slightly, a kind of provocation," it presents no meaningful argument and no record evidence to support that claim. The Aggressive Panhandling provisions could have created an exception for passive sign-holding, as the Downtown provisions did. The City could even have allowed for sign-holding in some locations and not others, perhaps on a sidewalk along the edge of a parking lot but not at a driver's door. An ordinance with a sign-holding exception would clearly restrict less speech, and

REV. 189, 196 (1985) ("there is no yardstick of impermissible indeterminacy"). Courts have often let quite poorly-defined criminal statutes stand, although the vagueness doctrine has been applied with special force to "street-cleaning" ordinances that regulate loitering and disorderly conduct. See Debra Livingston, *Police Discretion and the Quality of Life in Public Places: Courts, Communities, and the New Policing*, 97 COLUM. L. REV. 551, 610-11 (1997). See, e.g., *Papachristou* v. *City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) (vagrancy); *Kolender* v. *Lawson*, 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (loitering). Because I hold that the Ordinance in its several challenged dimensions violates the First Amendment, I do not need to reach this difficult due process issue.

12. The City does not refer to any record evidence suggesting that these locations are, indeed, dangerous. Rather, it relies on the bare assertion that the solicitation of money contains, inherently, an element of violence. Such a contention is in a great deal of tension with *Schaumburg* and its progeny.

would do so without any meaningful loss in public safety.[13]

Similarly, the location-based restrictions would prohibit organized charitable groups from soliciting immediate donations in buffer zones. While there is nothing inherently less threatening about someone raising money for a third-party as opposed to for themselves, it is clear that many organized groups seeking donations—firemen and Girl Scouts, for example—are not widely viewed as threats to public safety. Yet these groups would also be barred from operating near a parking lot or a bus stop, foreclosing, for example, traditional fundraising locations like sites outside a grocery store entrance.

Nor is a buffer zone always required to protect public safety. For example, the City's concern about panhandling near the outdoor seating of a restaurant is, essentially, that restaurant patrons who cannot leave mid-meal will be pestered by pan-

handlers. Even if this concern touched on public safety rather than a business's customer experience, imposing a 20-foot buffer around the public seating area is not necessary. That buffer prohibits panhandling on the sidewalk, not panhandling from those in the outdoor seating area. No theory or evidence has been offered as to how pedestrians walking *near* an outdoor café are unusually threatened by panhandlers. While a buffer zone of some sort might be appropriate around some facilities, such as ATMs, the Ordinance imposes buffer zones uniformly.[14] In all these ways, Lowell might have enacted a less restrictive ordinance that was equally protective of public safety. The City failed to do so, and the location-based definitions of aggressive panhandling therefore fail to satisfy strict scrutiny.

## III. CONCLUSION

For the reasons set forth above, I GRANT plaintiff's motion for summary

13. Although I loathe to place too much evidence on this point, it bears noting—as illustrative of the unexamined character of this less restrictive alternative—that the mayor of Lowell, in his deposition, did not realize that even passive sign holding was prohibited in these buffer zones.

14. Plaintiffs also argue that the buffer zones could be smaller and therefore be less restrictive. It is of course true that a ten-foot buffer would restrict less speech than a twenty-foot buffer. Taking the "least restrictive means" test literally, there could be no reason to uphold a twenty-foot buffer: a nineteen and a half foot buffer would restrict less speech and surely sacrifice nothing in diminishing public safety. Yet this exercise in diminishing boundaries, which would whittle buffers down inch by inch, is not required by the First Amendment. The number of feet a buffer zone extends, even under strict scrutiny, is not "a question of constitutional dimension. ... it is a difference only in degree, not a less restrictive alternative in kind." *Burson* v. *Freeman*, 504 U.S. 191, 210, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992). If a buffer zone approach is constitutionally permissible in this case, these dis-

tances are likely sufficiently tailored, absent a showing that 20-foot buffers prevent entire categories of speech (as with the buffer zones in *McCullen*, which the court found to prevent "sidewalk counseling" in a manner that appeared compassionate and trustworthy, 134 S.Ct. at 2535), block off entire neighborhoods from panhandling, or otherwise are different in kind rather than degree from 10-foot buffers.

For similar reasons, I find plaintiff's argument that Lowell's ordinance is more restrictive than other anti-panhandling provisions across the country unpersuasive. Of course, the fact that the Ordinance might be "truly exceptional" is relevant in addressing the tailoring inquiry, in that it is illustrative of the seriousness of the burden on speech, *Cutting*, 802 F.3d at 87. However, plaintiffs cannot show that Lowell's ordinance is not the least restrictive means available to protect public safety simply by pointing to less restrictive ordinances elsewhere. Otherwise, the passage or repeal of an anti-panhandling ordinance in one city would enlarge or contract the First Amendment rights of panhandlers everywhere else.

judgment and DENY defendant's motion for summary judgment,[15] and declare:

Section 222-15 of the City of Lowell Code (the "Ordinance") is in its entirety violative of the United States Constitution[16] because

(A) The Downtown Panhandling provisions of the Ordinance are violative of the First Amendment of the United States Constitution; and

(B) The Aggressive Panhandling provisions of the Ordinance are violative of the First Amendment of the United States Constitution, in that none of the ten behaviors identified can be proscribed as they are through the Ordinance.

**15.** Because no part of the Ordinance survives First Amendment scrutiny, I do not decide defendant's motion for summary judgment on plaintiffs' Fourteenth Amendment claims, which include both due process concerns, *see supra* note 11, and equal protection claims. Nevertheless, I note that plaintiffs' equal protection claims appear essentially coterminous with its First Amendment claims, because speech is a fundamental right. *See Speet* v. *Schuette*, 889 F.Supp.2d 969, 979 (W.D.Mich. 2012) *aff'd*, 726 F.3d 867 (6th Cir.2013) ("the Equal Protection analysis largely duplicates the First Amendment analysis in this case... strict scrutiny applies."); *Police Dep't of City of Chicago* v. *Mosley*, 408 U.S. 92, 96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) "[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views."

Plaintiffs' additional equal protection theories would likely be unavailing, however. It would be difficult to show that this Ordinance rests on the "bare desire to harm a politically unpopular group." *City of Cleburne, Tex.* v.

*Cleburne Living Center*, 473 U.S. 432, 446–47, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Rather, the City's interests in public safety and protecting tourism are not disputed. Moreover, the poor and homeless are not suspect classes. See *San Antonio Indep. Sch. Dist.* v. *Rodriguez*, 411 U.S. 1, 28, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Kreimer* v. *Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1269 n. 36 (3d Cir.1992).

**16.** No permanent injunction is required in this case. Massachusetts assumes that its municipalities will "do their duty when disputed questions have been finally adjudicated" and can "rightly be expected to set an example of obedience to law." *Commonwealth* v. *Town of Hudson*, 315 Mass. 335, 52 N.E.2d 566, 572 (1943). I share that expectation. Lowell has voluntarily refrained from enforcing the Ordinance while this litigation has been pending and I fully anticipate that it will acquiesce in this decision declaring the Ordinance unconstitutional without further formal coercive relief. *See also Steffel* v. *Thompson*, 415 U.S. 452, 467, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (declaratory judgments were intended to provide an alternative to injunctions against state officials).